UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                                  Case Number 14-20280

v.                                                Honorable David M. Lawson

LAZELL MCCLELLON,

        Defendant.

_____/

## **OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR NEW TRIAL**

In the trial of this firearms violations case, Detroit Police Officer Charles Lynem testified that he chased defendant Lazell McClellon into an alley, where Lynem saw McClellon discard a handgun. McClellon eventually stumbled and fell to the ground, where he was apprehended. Lynem told his partner, Officer Adnan Baliji, that McCellon had "tossed the handgun," which Baliji recovered from the area that Lynem identified. Based on this (and other) evidence, the jury convicted McClellon of being a felon in possession of a firearm. Because his criminal record qualifies him as an armed career criminal, McClellon now faces a mandatory 15-year minimum sentence.

However, the day after Lynem testified — and before the jury went to deliberate — the Detroit Police Department suspended Lynem pending an investigation into charges that he made false reports of felony charges for weapon possession. Lynem later was criminally charged for that conduct. The government did not disclose that information. When the defendant discovered it, he moved for a new trial, arguing that the evidence was material, should have been disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963), and the undisclosed information undermines confidence in the jury's verdict. The Court agrees.

I.

McClellon was charged in a two-count indictment with possessing a firearm after having been convicted of a felony, contrary to 18 U.S.C. § 922(g)(1) (count one), and possession of a stolen firearm, 18 U.S.C. § 922(j). On October 30, 2014, after a three-day trial, the jury returned a verdict of guilty on both counts.

The parties agree on the basic facts. On the evening of April 9, 2014, three officers of the Detroit Police Department pulled up to a group of around 15 young men whom they saw standing in the middle of Cortland Street, in Detroit, Michigan. The officers got out of their car and approached the group, when one of the young men started to run. Officers Lynem and Balija gave chase, while Officer Brandon Washington stayed at the patrol car. After chasing the fleeing man for some distance, police cornered and arrested in him in an alley. After they secured the suspect in their patrol car, the officers returned to the alley and recovered a Glock Model 34 9mm pistol, serial number ULK074, which, as it turned out, had been stolen from a gun shop in Indiana. The fleeing suspect was defendant Lazell McLellon. During questioning, McLellon admitted to police that he was in Indiana during the time when the gun was stolen. However, when he first was confronted, McClellon identified himself by a fake name, which he later claimed was because he did not want police to find out that he had been out of the state in violation of his parole conditions.

The credibility of the two officers' account of events during the brief time between when they began the chase and when they arrested the defendant in the alley is the subject of the present motion. The officers testified at trial as follows.

Lynem testified that he saw one of the men in the group, whom he identified in court as the defendant, "take off running" west down Cortland Street. Lynem chased the man, who turned and

ran south up the driveway of the residence at 3301 Cortland. It was around 9:30 p.m. when the officers arrived on the scene, and it was "mostly dark" outside. However, Lynem had his flashlight trained on the defendant while in pursuit, and, when he was within ten or fifteen feet behind, he testified, he saw "a dark-colored handgun tucked in the left side of the waistband" of the defendant's pants. As Lynem continued to give chase, he saw the defendant's "left hand [] continuously grabbing and clutching at his left waistband area such that it appeared that he was securing the weapon that was tucked into his left-side waistband." The defendant made another turn into an adjoining backyard and ran across a large pile of construction debris. After the defendant traversed the trash pile, Lynem then "observed him draw the firearm from his left side waistband [and] discard the firearm to his left towards the bushes."

Officer Balija, Lynem's partner, testified that he also was involved in the pursuit, after he saw the defendant break away and start to run from the group of men in the street. As the defendant started to run, Balija observed that "[h]e looked at my direction and then he immediately clutched at his left waistband area," which in Balija's experience "indicated [] that he possibly was armed." As Balija followed the defendant and Lynem in the foot pursuit up the driveway, he also saw the defendant "gripping at an object underneath his shirt in the left waistband." Balija testified that it was "pretty dark" outside during the chase. Balija continued to chase the man, and he testified that, after he pulled out his flashlight to illuminate the fleeing suspect, "Once I had him illuminated [] I observed that his shirt had lifted up and revealed a butt of a handgun." As the defendant ran across the debris pile in the back yard, Balija observed that "he lost his footing and going — he went face down and I observed him pull onto the — onto the butt of the handgun, onto the hand [sic] of the

handgun." Balija lost sight of the fleeing suspect for several moments after he turned from the back yard into an alley.

When Balija entered the alley, he found the defendant laying face down on the ground, and Lynem preparing to handcuff him. After the defendant was cuffed and removed from the alley, Lynem told Balija that "he tossed the handgun." The officers saw no one else in the alley when the defendant was brought to ground, or when they returned 20 or 30 seconds later, after securing him in the patrol car, to search for the gun. As soon as Balija went back to the alley from securing the defendant, he "immediately went to the area where, where [Lynem] told [him] that [the defendant] discarded the weapon and [] recovered a Glock Model 34 handgun."

On October 30, 2014 — the day after he concluded his testimony in the trial of this case — the Detroit Police Department (DPD) suspended Officer Lynem pending an investigation into charges that he made false reports of felony charges for weapon possession. In October 2015, the Wayne County prosecutor charged Lynem with two counts of false reporting under Michigan Compiled Laws § 750.411a(1)(b), for allegedly false reports made on March 18, 2013 and September 27, 2014. When the defendant's attorney learned of the charges, he asked the government's attorney whether a *Giglio* check had been done on Officer Lynem before trial. The government responded that in August 2014 government counsel requested *Giglio* materials on Officers Lynem and Balija from the DPD, and the department replied that there "were no disciplinary issues" for either officer. In April 2016, the government's attorney made another *Giglio* request and again received the response that "Lynem's disciplinary records were clear." The government represents that it later learned, however, that "pending internal investigations are confidential and are not disclosed to [the] DPD disciplinary administration."

The parties stated that the criminal case against Officer Lynem was set for a jury trial in late May 2016, but no subsequent information was offered, and the record does not indicate whether or how that trial concluded.

On March 17, 2016, the defendant filed his motion for a new trial under the authority of *Brady v. Maryland* and Federal Rule of Criminal Procedure 33(b)(1).

The government represents that, on April 6, 2015, the defendant "met with the government to try to reduce his sentence," and, during that interview, he "admitted to Agent Hamm that he tossed the gun from Indiana as he ran from the police — but lied about when and how he obtained it." The defendant contends that the government's attorney advised defense counsel after the post-conviction interview that the government believed the defendant had not made a truthful proffer.

II.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The defendant argues that a new trial is required because the government failed to disclose evidence that would have undermined the credibility of it's key witness — evidence that likely would have caused a jury to take a far different view of the facts. The failure to disclose that evidence, says McClellon, denied him his right to due process of law.

"'[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Wearry v. Cain*, --- U.S. ---, 136 S. Ct. 1002, 1006 (2016) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "[T]he rule stated in *Brady* applies to evidence undermining witness credibility." *Ibid.* (citing *Giglio v. United States*, 405 U.S. 150,

153-54 (1972)). "Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Ibid.* (quoting *Giglio*, 405 U.S. at 154) (quotation marks omitted). "To prevail on his *Brady* claim, [the defendant] need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Ibid.* (quoting *Smith v. Cain*, --- U.S. ---, 132 S. Ct. 627, 630 (2012)). "He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Ibid.* "[The defendant] can prevail even if [] the undisclosed information may not have affected the jury's verdict." *Id.* at 1006 n.6.

The Assistant United States Attorney cannot be faulted here for the nondisclosure. There is no suggestion that he engaged in active suppression of his key witness's credibility blemishes. Nonetheless, "the . . . prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995). "But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Ibid.* (citation omitted). "[T]he *Brady* duty extends to impeachment evidence as well as exculpatory evidence, and *Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Youngblood v. W. Virginia*, 547 U.S. 867, 869-70 (2006) (quoting *Kyles*, 514 U.S. at 438).

There can be no doubt that Officer Lynem certainly knew, at the latest by October 30, 2014 when the trial was still ongoing, that he had been suspended from his duties with pay pending an investigation into his misconduct. That misconduct consisted of making false charges of weapon possession offenses on at least two other occasions. And Lynem must have known that the evidence

would have sufficiently damaged the credibility of the government's primary eye witness to raise a reasonable likelihood that it could have affected the judgment of the jury. Whether or not the attorney for the government knew of that information, a *Brady* violation still occurs where the police know information that should have been disclosed but fail or refuse to inform the prosecutor. *Youngblood*, 547 U.S. at 869-70.

The impeachment of Officer Lynem's testimony would have had a devastating impact on the government's case, because Lynem was the only witness who was in the alley at the moment when McClellon allegedly pulled out the gun and tossed it. Officer Balija testified that he did not enter the alley until after Lynem had the defendant on the ground, and when he recovered the gun, he only knew where to look for it because Lynem told him where it was. If the jury were to seriously question — or entirely disregard — Lynem's testimony, then the uncontroverted evidence otherwise tends to suggest only that: (1) the defendant was pursued by two officers on foot; (2) the officers arrested him in an alley; (3) minutes later, they retrieved from the alley a gun that turned out to have been stolen from a gun shop in Indiana; and (4) the defendant was in Indiana during the time when the gun was stolen. That circumstantial chain of evidence may be compelling, but it certainly is not overwhelming proof of the defendant's guilt. Lynem's testimony is the only basis that clearly connected the dots between those circumstances to make an unassailable presentation. If that testimony is placed in serious doubt, then the case is put into a much different light. Evidence that Lynem fabricated weapons charges against others "could have affected the judgment of the jury." *Giglio*, 405 U.S. at 154.

The government correctly points out that Officer Balija also testified to seeing the handle of a gun in the defendant's waistband as he chased the defendant into the alley. However, both officers

testified that it was "mostly dark" or "pretty dark" at the time of the chase. The jury would have good reason to question the accuracy of the officers' perceptions of a fleeing suspect, dressed in dark clothing, being chased at a dead run, through a darkened driveway, yard, and alley, aided only by the illumination from their handheld flashlights. Moreover, Balija's testimony at trial was conspicuously conditional when he described his perception that the defendant had a gun:

> I am *believing that he is armed*, so I'm going off to the right, and being that *if — if — in case that Mr. McClellon does have a firearm* and he actually pulls it out and starts, you know, shooting at me, I don't want him — if I have to return fire, I don't want to shoot my partner.

Trial Tr. vol. 2 at 68 (emphasis added). And Balija also conceded that, after seeing the defendant "clutching" at his waistband and becoming concerned that he might be armed, he was highly stressed and had entered a state of "tunnel vision" based on concern for his and his partner's safety due to the possible threat:

> Q. Did you observe Officer Lynem do or say anything to the Defendant while the Defendant was in the backyard?
> A. I don't remember. I was, like, focused in; like, being that, like, you know, it's such high stress, um, your vision just gets narrower and so there is a lot of things that, you know, you just — you just tune in to the threat.

Trial Tr. vol. 2 at 72. Finally, Balija admitted that during the chase his view of the fleeing suspect was blocked several times by Officer Lynem, who was ahead of him. Balija conceded that he did not see anything that happened in the alley between the time when the fleeing suspect made a hard turn from the yard to the alley and when Balija cautiously rounded the corner to find that Lynem had apprehended the defendant. Considering all of the circumstances, the jury readily and seriously could question the accuracy of Officer Balija's perception, and, absent the positive corroboration of Officer Lynem's account, may well have found Balija's testimony less compelling.

The government contends that the defendant has failed to make an adequate showing of materiality under *Bagley*, because even if Lynem's testimony is entirely disregarded, "the remaining evidence is enough" to support a conviction. However, "[t]his rule is clear, and none of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone." *Kyles*, 514 U.S. at 435 n.8. As the Supreme Court has explained:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."
>
> The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id.* at 434-35 (quoting *Bagley*, 473 U.S., at 678). What the defendant must show is a "reasonable likelihood" that the undisclosed impeachment evidence "could have affected the judgment of the jury." *Wearry*, 136 S. Ct. at 1006 (quoting *Giglio*, 405 U.S. at 154). Here he certainly has.

The defendant has shown that "the new evidence is sufficient to 'undermine confidence' in the verdict." *Ibid.* The government had two material on-the-scene witnesses, only one of whom claimed to have observed the most salient conduct comprising the res of the offense. The withheld information well could have destroyed the credibility of its strongest witness in the eyes of the jury. "Disclosure of [the impeaching evidence] would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441. And that suffices to put the case into a markedly different light.

The government contends that it was not obligated to disclose information about investigations into charges that were merely preliminary. However, where an officer is disciplined for misconduct directly relevant to the credibility of the charges in the pending case, that information is sufficiently material to require disclosure. *Milke v. Ryan*, 711 F.3d 998, 1007 (9th Cir. 2013) ("When it was finally disclosed in federal court in 2002, the report [from the police personnel file] showed that [Officer] Saldate had suffered a five-day suspension for accepting sexual favors from a female motorist and then lying about it. That Saldate was disciplined for lying on the job obviously bears on his credibility and qualifies as *Giglio* evidence."). The government's attorney contends that its *Giglio* requests were stymied by either a lack of communication or a policy of non-disclosure by the DPD concerning "internal" investigations. But that cannot excuse the failure to disclose where the government's own arresting officer certainly knew about the misconduct investigation and either failed to inform the prosecutor, or perhaps actively concealed it.

The government relies on several unpublished Sixth Circuit cases and other non-binding decisions for the proposition that it had no obligation to discover information of an "unrelated" investigation carried out by agents of a separate entity. However, none of those cases involved an active investigation of misconduct by the government's principal witness and the arresting officer in the case at bar, where that officer was subjected to discipline based on his misconduct before the verdict was returned.

*Sutton v. Carpenter*, 617 F. App'x 434 (6th Cir. 2015), is distinguishable because there the court of appeals relied on the fact that the defendant "offer[ed] no evidence that the *same* TBI agents or teams participated in both investigations" of the defendant and the government's expert witness. *Id.* at 440. In this case, the arresting officer did not participate in the investigation of his own

-10-

misconduct, but he certainly knew about it, and the factual circumstances that provoked it. Knowledge of impeachment information cannot reasonably be said to be held by an "uninvolved government agency" when it was known by the same police officer who was a primary agent of the instant prosecution.

The government cites *United States v. Taylor*, 471 F. App'x 499 (6th Cir. 2012), but that case also is distinguishable. The *Taylor* court held that a prosecutor's opinion about a government agent's veracity in a search warrant affidavit and an offhand remark about the attorney's "concerns" recorded in another officer's case notes were not subject to disclosure, observing that "[n]o court, to our knowledge, has held that *Brady* mandates the disclosure of internal memoranda on the basis that they contain unsubstantiated conjecture about a testifying officer." *Id.* at 520. Unlike *Taylor*, the information here did not suggest mere "concerns" or "unsubstantiated conjecture," but instead tends to show that the charges of misconduct were credible and serious enough in the eyes of the department to warrant a suspension with pay pending resolution, starting the day after the officer accused of misconduct testified in this case, and on the eve of the jury's verdict.

Finally, *United States v. Douglas*, 634 F.3d 852 (6th Cir. 2011), provides no suport for the government's position. In that case, the Sixth Circuit found that evidence of a witness's undisclosed conviction was not material because the defendants "only point[ed] to one fact about which no other witness testified — that [they] protracted negotiations for the 1995 Validation Center move. . . . Even assuming that they are correct, that fact was in no way essential to either conviction." In this case, the one fact about which only Lynem testified — that he saw the defendant remove a gun from his waistband and throw it away, just before he was arrested — was indisputably essential to the

conviction, because it was the most compelling single piece of evidence tending to establish that the defendant possessed the weapon in question.

The government also argues that because McClellon admitted guilt in a post-trial debriefing, he cannot show that the newly disclosed evidence "would likely produce an acquittal if the case were retried." *United States v. Dubrule*, 822 F.3d 866, 885 (6th Cir. 2016) (quoting *United States v. Garland,* 991 F.2d 328, 335 (6th Cir. 1993)). The evidence of McCellon's post-trial statements, if admissible, would be problematic for him. But the withheld *Brady* evidence could also result in the jury's wholesale rejection of the police officer's testimony. Because of the serious nature of the *Brady* violation here, the Court is satisfied that a new trial is required.

The defendant was entitled to the information about Officer Lynem's prior misdeeds. The failure to disclose that evidence violated McClellon's right to due process, as the Supreme Court has defined it in *Brady v. Maryland* and the cases that follow it. Because the withheld evidence "likel[y] could have affected the judgment of the jury," *Wearry*, 136 S. Ct. at 1006 (citing *Giglio*, 405 U.S. at 153-54), "the interest of justice . . . requires" that the defendant be granted a new trial, Fed. R. Crim. P. 33(a).

III.

The suppression by Officer Lynem — and therefore the government — of material evidence that was favorable to the defendant amounts to a violation of the defendant's right under the Due Process Clause of the Fifth Amendment. He is entitled to a trial in which the jury will be able to consider the evidence.

Accordingly, it is **ORDERED** that the defendant's motion for a new trial [dkt. #65] is **GRANTED**.

It is further **ORDERED** that the parties appear for trial on **June 13, 2017** at **8:30 a.m.**

                                              s/David M. Lawson
                                              DAVID M. LAWSON
                                              United States District Judge

Dated:   May 16, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 16, 2017.

                      s/Susan Pinkowski
                      SUSAN PINKOWSKI